Good morning, Your Honor. This is Stanton Blum on behalf of the appellant, Petitioner Robert Gonzalez. Let me just check with Mr. Parkhurst. Can you hear us okay, Mr. Parkhurst? Yes, I can, Your Honor. And Judge Gould? I can hear everybody and see everybody, thanks. Okay, good. All right. This is a case with one indictment, two trials. The case was severed. The first case involved a shooting of my client's girlfriend's boyfriend. The second case involved a couple weeks later when he got arrested, he was confronted by some undercover police officers, and there was a second shooting. He was convicted of attempted first-degree murder on both of those counts and received, and that's the main complaint we have here today, 18 years on both counts, aggravated sentences, which he's presently serving now in the Arizona State Prison. The first and most important thing I want to talk about today is the premed instruction. The premeditation instruction here, there's no question that even the Attorney General agrees that this was a flawed instruction. The question now becomes whether or not it was a structural error or whether it was primarily harmless error. And I think that the lower courts did not understand the full facts of this case. I don't think it's harmless error. And when you combine that with all the other error that occurred in the case, I don't think that Mr. Gonzales received a fair trial. Now, an error was the default. Counsel, counsel, Judge Gould, if I could ask you a question. Why would this be a structural error question rather than just the standard Brecht formula for whether there was a an injurious effect of the mistaken instruction? I guess under Thompson, the instruction seems clearly wrong. So, you know, you went on that part. But why would we say it's a structural error rather than apply the Brecht standard? Well, under Sullivan, I think it's a structural error because when you're talking about it, and I think Judge Hawkins was about to say something, I don't know, maybe I'm reading his mind, but that we're talking about the actual flawed instruction, the language itself, which requires in Arizona, the law is that it requires actual reflection. And in this case, that instruction was never given. Your Honor is correct. What makes it structural error, as far as I'm concerned, and maybe the Nader case is probably opposed to what I'm saying, but because you can't have a case, you can't say beyond a reasonable doubt that that instruction did not affect his verdict. I'm not saying that's true. It's not true. There's no way you can do that because the whole idea of premeditation murder, even whether it's attempted or first degree without attempt, is actual reflection. So I don't see how you can get around it. It's no different than a reasonable doubt instruction that's an improper reasonable doubt instruction. So in the cases, the cases that Nader case involved, the fraudulent instruction, I don't think in this case it goes to the very heart and core of the case. And so that's why I think it's structural error. But regardless, regardless, though, I still think it's a case where if you have actual reflection and the prosecutor is able to argue to the jury that you don't need reflection, actual reflection, you just need two instantaneous thoughts. I mean, there's absolutely no room for reflection. You have to look at each trial separately. What? You have to look at the circumstances of each trial separately. That's correct. Right? Yes. If you go to the first one where he shoots the boyfriend. Yes. Why isn't there, if you just look at the evidence that was presented to the jury at that trial, why wasn't there enough to show that he reflected, that there was actual reflection? Well, here. He said he was going to leave, and then he didn't leave. He came with a gun. Well, not exactly. He came with a gun? Yeah. He had a gun. All right. Look it, I'm not here to argue that he did have a gun in both cases. But what happened here is he goes and he confronts. Focus on the first trial. Yes. I'm going to go to the first trial. He goes out. He sees the boyfriend. The boyfriend says something. He asks something about his daughter. The boyfriend says something to him. And then he says he's going to leave. I'll come back later. In fact, even the girlfriend who's out there says he's going to come back later. But the boyfriend says, no, no, no, you're not going to come back later. You're going to stay here and fight like a man. And so he's challenging him at that point. So here's the interesting part about it, though, Your Honors. What he does is that he goes and he confronts Mr. Gonzalez because he says to him they asked him at the trial, they said, was he coming closer to you? Was he approaching you? Like Your Honor says, he wasn't leaving. That's not what happened. What happened was the answer by the Mr. Humo was, no, I became the guy got nearer to him. I approached him. I'm confronting him. In fact, we know that he was at the time of the shooting was practically a contact wound. He was a foot and a half away. The defendant is leaving, but Mr. Humo is advancing. So I don't know how much time there is for him to reflect about whether he's shooting him, because if he's thinking about shooting him and he's out there right away, he could shoot him right then and there. I mean, but if you're reflecting, where is the time for reflection? But this is the point. Isn't that a jury question? Isn't that a question that goes in front of the jury for them to decide and not have the prosecutor basically getting a directed verdict by saying, oh, well, he really did reflect? Even Your Honor says, well, maybe I think, you know, maybe there was time for reflection. I don't think there was, but even if there was, isn't that something that should go to a jury with a proper instruction and not something that should be determined   And it gives you room for some discussion. Tell me why there wasn't a switch to the second trial. Switched to the second trial. Here's a case where he's out on the street now, a couple of weeks later. He's in a neighborhood in south Tuscon, which is – I know the neighborhood. It's not a very nice neighborhood. It's a pretty rough neighborhood. He's out in that neighborhood, and that's established because even they said there was like some crack houses in the vicinity, which they shouldn't have referred to, but they did. But we're out there, and he's walking down the street, and they do a takedown. They have a takedown maneuver where there's cars from both sides approach him, and he's in the middle on the street. And supposedly the officer says to him, you know, stop police. Nobody hears that. There's four or five witnesses out there, other police officers out there, and not one person hears that. He's out on the street now, and so the officer – at that point, he sees somebody, and he's got a gun. And he's behind a truck, and there's another officer in front of him. They're in unmarked vehicles. They're in plain clothes. I mean, is he to assume that they are police officers? And at that point, you know, they have guns. He fires a shot, and someone shoots him in the back. The other officer shoots him in the back. Now, I don't know where there is time for reflection, but once again, isn't this a jury question? No. So there was more to the story than just walking down the street. I mean, it comes out during his testimony that he knew there was a warrant out for his arrest. Well, I think that happened during the trial where he had to say that. I don't know if he – Well, he took the stand, didn't he? He took the stand, and he said that. He did. He did say that. Yes. But that doesn't mean – He said he knew that there was a warrant out for his arrest. He said that he bought the – bought a Mac – was it a Mac 11? Mac 11, yes. And at first he testified he didn't know it was an automatic, and then he – and then through further cross-examination, he admitted that he knew that it was an automatic weapon. Well, he had – yeah, he did. Of course he did. Yeah. But he lives in that area, and he's out there in his neighborhood. He's walking down the street with a Mac 11 in his pocket. All right.  Now, one doesn't usually walk down the street with a Mac 11 in your pocket. Well, if you live in South Tucson, let me tell you, Judge, you – almost everybody carries a weapon. And when I first tried a case when I moved from – when I was a young man, a very young man, moved to Arizona. And I tried a case, and I asked the judge to – on a murder case, to ask the judge to question about anybody who owned a weapon. And he said, I'm not going to do that, Mr. Bloom. And then I – he got on the bench, and he got out there, and he said, is there anybody here that doesn't own a weapon? Because that's – I don't know. I can't – I don't know how to explain that to you, but in Arizona, people – it's not the Wild West, but it's pretty close. Right. His argument was that it was – he acted in self-defense. That's right. Does that make any difference here? What? Does that make any difference here, that that's what his defense was, self-defense? Yeah, I think it makes a difference. Why? Because I think it shows his state of mind at the time of the shooting, that he was certainly didn't have time to reflect, but he's – all he's thinking of is someone shooting at him, and all he said in his statement was, alls I say is that I was acting in – I shot him in self-defense. I thought he was going to shoot me. So here's – he's walking down the street. There's a car in front of him with police officers unmarked. He doesn't know that. There's someone behind him. He doesn't know that. Someone – he turns around, he sees a gun pointed at him. He shoots the guy in front of him. The guy in the back shoots him – behind him shoots him in the back. And the – Does it make any difference that he didn't – that he didn't know that they were police officers? Oh, I think it makes a big difference. Why? Of course. The police officers, I don't know if you have a right to just shoot a police officer. Of course not. What – I wouldn't be standing here if I saw that. For purposes of reflection and deliberation. Well, I think it's just – you know, it happened that quickly. I mean, even the police officers said that. And, of course, we know they didn't announce their office. They never – he didn't say that. Well, he testified. He testified. Was it Officer Bell? Testified that he – Blue. Officer Blue, yes. Blue. Officer Blue testified that, you know, he used a loud voice and said police, Tucson police. He went through this whole – Get on the ground. All that. And he went through that whole elaborate speech. And that – and all the other officers out there, there were four other officers out there and civilians, and not one person – two women out there as well – not one person heard that. And so then the State, realizing that that's a problem, they said, well, it's his habit to go ahead and do that on most occasions. But it's like Judge Hawkins said, sitting through the arguments here, it's what he did on this case, you know, not what the habit is, you know, what he might do on some other case. And so he didn't do that on this case. So that's why – and then you couple this with all the other errors that have occurred in this case. And if I have time, I'll go through them. But, I mean, it's a lot of things to talk about. But – and the closing argument of the prosecutors in both cases, the things she did and the questions that she asked the defendant, because you mentioned on cross-examination, she asked him, how many times do you carry a weapon? Why didn't you surrender yourself? You know, those kind of questions. And she goes into the fact about the first trial, the second trial, and she talks about his conviction in the first trial. And that 12 people, just like the people sitting here in the jury box, found you guilty. Like, as if to say, well, why shouldn't this jury find you guilty? I mean, all these kind of questions that are so prejudicial that there's no way that he could have received a fair trial. Did you want to save some time for rebuttal? Well, yes, of course. Mr. Bloom, are you CJA or retained? I'm retained, Your Honor. Okay. Thank you. May it please the Court. Your Honors, Joseph Parkhurst for the State of Arizona, arguing for Respondents. I'll first touch on the meditation – premeditation instruction. Judge Gould's comments about how breadth applies here is correct. I think that the briefing sets out that Nieder establishes that erroneous instructions are subject to harmless error. The state court in this case conducted a harmless error analysis of the premeditation instruction, found the instruction incorrect but harmless, and the district court concurred and found that the state court conclusion was not contrary to Nieder. In Fry v. Plyler, a more recent case, a 2007 U.S. Supreme Court case, the court established that the habeas court assesses prejudice under the Brecht standard, and it analogized the Brecht standard to actual prejudice. And this court, more recently in Ayala v. Wong, said that the habeas court applies Brecht without regard to the state court's harmlessness determination. So I think it's very clear all the case law establishes that Brecht is the standard. And under Brecht, I think it's also clear on the facts of this case that the premeditation instruction given at both trials was harmless. First of all, in the Humo shooting, the first trial, a week before the actual shooting, Mr. Gonzales told Alyssa Preciado, his former girlfriend, that it was Mark Humo's fault that he couldn't see his daughter. Gonzales came over to the house with a gun. He confronted Humo about the daughter. They got into an argument. They exchanged a certain amount of, you know, posturing. The victims, both victims asked Mr. Gonzales to put the gun down, meaning that he was brandishing the gun. No actual physical fight occurred at this point to occasion the use of the gun. Gonzales at one point said he was going to leave but did not leave. And that certainly shows reflection. But I think the strongest piece of evidence is that Mr. Gonzales shot Humo several times, or at least shot the gun several times at Humo even while Humo was retreating because of the, we know this from some of the wounds. Not only was the evidence at the trial supportive of premeditation outside any argument that it was merely the time, supported premeditation, but really there was no substantial or injurious effect on Mr. Gonzales' defenses either. His defense was that he was not present, and the erroneous premeditation instruction did not deprive him of this defense. Alternatively, Mr. Gonzales argued that the shooting was an instant effect of a sudden quarrel. Well, the premeditation instruction given at his trial said that it's not first-degree murder if it's the instantaneous effect of a sudden quarrel. So he was not deprived of that defense either. If we take a look at the second shooting, which I call the Lewis shooting, Mr. Gonzales had recently acquired the MAC-11. It's perfectly legal to carry certain firearms in Arizona, but the evidence shows that Mr. Gonzales reflected long enough to decide not to shoot Officer Blue, who was the officer that accosted him verbally and said, Tucson police, get on the ground, but instead turned around, aimed his weapon at Officer Lewis, who was coming up from behind him in a vehicle. But more stronger than that is Mr. Gonzales admitted he knew there was a warrant out for his arrest, admitted he intended to shoot at Lewis in self-defense, he claimed, and admitted knowledge that pulling the trigger could kill Lewis. So his self-defense defense showed that he intended the result, and merely misidentifying the police officers, as he alleges, had nothing to do with whether he premeditated. So I would submit that the district court got the right standard of review here and properly adjudicated this claim. As far as Mr. Bloom mentioned the purported prosecutorial misconduct in the second trial, we have to remember that evidence of Mr. Gonzales' conviction from the first trial was admitted in order to impeach him, if in the event he denied having any involvement in the prior shooting. Well, he got on the stand in the second trial, and he denied having involvement in the prior shooting. So by the trial court's ruling, the prosecutor was allowed to introduce and subsequently argue that, yeah, 12 people did convict you of that shooting. So if you deny it, this jury can consider that. While there's any number of other allegations of misconduct in the second trial, he only objected to three of them. One of them was the one I just mentioned. The other one was the prosecutor argued, well, we have no idea what story is going to be concocted on the stand. We have to understand that, first of all, he did not object to this at the time, and second, that this was fair rebuttal to Gonzales' own closing argument that the state could have called rebuttal witnesses if it didn't believe him. So the law is fairly clear that argument that is fair rebuttal to issues raised by the defense is fair for the prosecutor to agree to that. And as far as the only other preserved misconduct claim is that the prosecutor in the second trial argued they need to take him down before he went to the house, implying that there was something nefarious going on at the house. However, again, this is fair rebuttal to the defense argument that the police had rushed in to arrest Gonzales before they had the proper personnel available. Moreover, there's no suggestion at trial that the house contained weapons or guns. That was a completely unopened door. The prosecutor even argued that the reasons for taking Gonzales before he reached the house were immaterial. So none of these instances of alleged misconduct in any way prejudiced Mr. Gonzales. There's a lot of issues in this. There are. But could we go back to your argument about the premeditation instruction at the second trial and focus for a minute on the prosecutor's closing argument where she emphasized to the jury that there was time to reflect and suggesting that's all that was required. Well, at the time that she argued that, of course, Thompson had not come out in Arizona. When Thompson did come out in Arizona, it did not say that the passage of time was not evidence of premeditation. All it said is it can't be the only evidence of premeditation. And in this instance, the prosecutor argued many other pieces of evidence that supported premeditation completely aside from the passage of time. Did she run through the same items that you just did? Yes. Yeah. They're basically the same arguments that she made. Okay. So the not only was it introduced that trial, these alternative support for premeditation, but the prosecutor argued did not just exclusively argue the passage of time. She argued all these other items of evidence to support premeditation in the second trial. And if the Court has no questions about any other issues, I'd be happy to submit. Okay. No questions here. No. That's fine. Thank you, counsel. Mr. Bloom, you've got some time for rebuttal. Thank you. Well, I don't think the prosecutor argued what the Attorney General just said. I think what the prosecutor argued was that you don't need any time for reflection. You don't need any actual time for reflection. That's the malady in this flawed premeditation instruction that was given to the jury. In the you're talking, that's the second trial. You're talking about the second trial. Yes. Yes. And she argued about this instantaneous thought. I've always objected to that instruction. And finally it came around that they realized that that just wasn't. Well, it doesn't take long. It doesn't take much time to satisfy reflection. No. It can take a short amount of time, but it has to. It can take a couple of seconds. Well, I don't know how long it takes, but it does take actual reflection. That's the malady here. And that's not what the jury was told by the judge and by the prosecutor. So how do you respond to counsel's argument that there was evidence of reflection can be seen by his decision not to fire at Bloom, but to fire, but to shoot his weapon down at Bloom? At Bloom. At Bloom. Yes. And to shoot Lewis. Yes. Well, my answer to that is simply that he is walking away. He's walking down the street, according to the witnesses, the lay witnesses as well as other police officers. He's confronted. Supposedly he sees Officer Bloom behind a truck. You know, he's behind this truck. He's wearing some kind of vest, but he can't tell if it's a police officer or not. He doesn't know that. In fact, he even says later on he doesn't know that. He's walking away. This man, supposedly, he sees him. He's got a gun. He keeps walking away from him, though. And now he's confronted by a person in front of him. And now this person has a gun. So he shoots that person. And that person shoots him. Well, I thought he testified that he turned back. He turned back. He saw Bloom. Yes. He pulled out his weapon. Yes. And he kept walking. Because Bloom said he saw the weapon, if I remember correctly. Correct. And then he decides to keep walking. He kept walking away. So he's trying to avoid the confrontation, just like he was in the first case. He wanted to leave. But now they said in the first case the same thing, you know, that somehow he did not, that he was challenging Mr. Humo. The record doesn't support that. The record supports that Mr. Humo was challenging him as well as his girlfriend. They both said, let's fight like a man. So we don't even know about a fight until Mr. Humo says that in the first case. And in the second case, I mean, this — we're on the street, Judge, in the middle of a — in Tucson, in a rough neighborhood, and all of a sudden he's confronted. So — and he doesn't know they're police. I don't know — and I don't know why this warrant somehow makes it more believable that he should know, because there's a warrant out for him, that he's going to be confronted by undercover police officers in unmarked vehicles. I don't know. And you couple that with all the other arguments that I've made in this case, and even the closing argument, where she makes all these — in the second trial, where she makes all these comments about that the police don't win anything, it's just justice, and you couple that with that he didn't contact the police or surrender himself. There's just so much error that there's no way that he could have received a fair trial. Roberts. Thank you, Mr. Bloom. Thank you very much for your argument, counsel. We appreciate all the arguments, counsel. The matter is submitted.
judges: Hawkins, Gould, Paez